UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

CHERYL A. ALEXANDER,

      Plaintiff,

v.                                         Case No. 14-CV-449

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

      Defendant.

---

## DECISION AND ORDER

---

This is an action for review of the final decision of the Commissioner of Social Security denying Plaintiff's application for disability insurance benefits (DIB) under Title II of the Social Security Act. 42 U.S.C. § 401 *et seq*. The Commissioner determined Plaintiff was not under a disability during the period she was insured for DIB—February 23, 2010 to June 30, 2011. For the reasons below, that decision will be affirmed.

### I. BACKGROUND

Plaintiff Cheryl A. Alexander lives with her husband and two of their five children in Antigo, Wisconsin. She filed her application for social security disability insurance benefits on September 8, 2011, at age 54. Until around 2010, Alexander had worked as a certified nursing assistant. Prior to that, she worked as a housekeeper. She testified that she lost her last CNA job, which required running to patients' beds when they sounded their medical alarms, due to her diabetes and hypertension. She also testified that she tried securing another CNA position to retain her license,

but was unsuccessful. Her alleged onset date, as amended, is February 23, 2010, and there is no dispute that her "date last insured" for DIB, meaning the date by which she had to establish she was disabled, is June 30, 2011. Plaintiff applied for disability due to diabetes, obesity, short-term memory loss and peripheral neuropathy (nerve damage).

Plaintiff's treatment records show a history of type 2 diabetes mellitus and a long history of noncompliance with treatment. In a neuropathy evaluation on February 23, 2010, she complained of numbness and pain in her feet. A physical examination was unremarkable, and the examining doctor suspected "run of the mill neuropathy as a result of her diabetes." (R. 230.) Plaintiff told the doctor she was retired at the time. The doctor recommended increasing her dose of diabetes medication since her symptoms were resolved most of the day on the relatively minimal dose she was taking at the time. (R. 230.) On May 7, 2010, Plaintiff told her treating physician, Dr. Bart Kneeland, she had stopped taking her medication recently. She told Dr. Kneeland that she had since resumed taking it and that it was working in the morning but was wearing off in the afternoon, resulting in numbness and tingling in her toes. (R.247.) Dr. Kneeland explained the importance of taking her medications as scheduled. In a follow-up on August 18, Plaintiff presented with "startling" weight gain. She weighed 180 pounds January 6, 2010 and 231 pounds August 18, 2010. Dr. Kneeland switched her medications. (R.245.) Plaintiff saw Dr. Kneeland again in September 1, 2010, and Kneeland noted she had a long history of noncompliance, but was doing well recently:

> She still does not check her blood sugars, but she is otherwise happy with how things are going. . . . She is feeling good, not having much for neuropathy, is happy with how things are going, sleeping well at night, and has already lost 8 pounds. She feels as though things have improved greatly and she is happy with how things are going. She has no other cardiovascular, pulmonary, gastrointestinal, or genitourinary complaints at this time.

2

(R.243.) Dr. Kneeland's objective findings were unremarkable.

Plaintiff reported to Dr. Kneeland she continued to feel better in a follow-up September 30, 2010. She noted when she walks, she actually feels better. (R.242.) She reported November 11 she was feeling good and her neuropathy improved greatly on her new medications. (R.239.) Kneeland's objective findings were mostly unremarkable but the results of Plaintiff's hemoglobin A1C test, a measure of average blood sugar in the previous several months, were high.

In a February 2011 follow-up, Dr. Kneeland noted Plaintiff's hemoglobin A1C results were the highest in years. She reported not feeling well, not checking her blood sugars and "not really" taking her medications. (R.237.) The doctor noted she was vague about taking her medications. She stated she had a little bit of shortness of breath with exertion such as going up steps. This was her last check-up before June 30, 2011, when her insurance status ceased. In July 2011, despite continued high blood sugar levels, she reported feeling good. (R.235.) In late July she reported nail changes in her left foot, including her big toenail getting thicker and thicker. (R.233.) Dr. Kneeland diagnosed onychomycosis, a fungal infection, and sent for a fungal culture. He also noted she was "having some numbness in her toes with some paresthesias [tingling or burning sensation] occasionally most consistent with a diabetic neuropathy." (R.233.) In none of the treatment records, however, is there any indication that Plaintiff was having difficulty walking.

The Social Security Administration (SSA) initially denied Plaintiff's application on January 10, 2012. State agency consultant Dr. Syd Foster assessed Plaintiff's physical residual functional capacity (RFC) and concluded, based on a review of Plaintiff's medical records, she could perform light work during the operative time period from February 2010 through June 2011. Foster noted that the symptoms noted in the medical records were of "mild neuropathy" but that Plaintiff did much

3

better when she was compliant with her medications and kept up with her blood sugars. (R.312.) The SSA also concluded Plaintiff had no medically determinable mental impairments. (R.318.)

Plaintiff continued treatment for diabetic foot care in 2012 but the SSA denied Plaintiff's application on reconsideration on July 30, 2012. Although late 2012 and early 2013 records show Plaintiff reporting feeling better, it is evident that her longstanding issues were escalating. Dr. Kneeland provided medical source statements dated January 2013 and July 2013 in which he opined that she was completely unable to work. (R.451, 638, 641.) In the January assessment Dr. Kneeland noted diagnoses of diabetic neuropathy and poor memory and a prognosis of "fair – will worsen." (R.451.) By the middle of 2013, two of Plaintiff's toes were amputated. (R.537, 561, 620, 627, 645.) In the July 2013 medical source statement Dr. Kneeland noted diagnoses of diabetic neuropathy and osteomyelitis, a bone infection, and prognosticated "long term problem with wavering symptoms" including "severe burning pain." (R.638.)

The SSA held a video hearing regarding Plaintiff's disability claim on September 13, 2013. Administrative Law Judge (ALJ) Debra Meachum issued a written decision on October 31, 2013. ALJ Meachum found severe impairments of obesity, diabetes mellitus, and peripheral neuropathy and found that, through the June 30, 2011 date last insured, Plaintiff had the RFC to perform light work. The ALJ gave "little weight" to Dr. Kneeland's opinions, noting they related to her condition in 2013, long after her last insured date, and were "not entirely consistent with other substantial evidence of record prior to the claimant's date last insured." (R. 33.) Instead, the ALJ gave "great weight" to the state agency consultants, including Dr. Foster, who opined as to her condition during the relevant time period based on his review of Plaintiff's file. Nonetheless, the ALJ included RFC limitations that Plaintiff could not climb ropes, ladders or scaffolds, but could occasionally climb

4

ramps and stairs. The ALJ also allowed in the RFC that Plaintiff could be off task up to 10% of the workday, exclusive of normal breaks. (R. 32.) Based on the testimony of a vocational expert, described in more detail below, the ALJ found Plaintiff was capable of performing her past relevant work as a housekeeping cleaner. Accordingly, the ALJ concluded that, up to and including the date last insured, Plaintiff was not disabled.

The Appeals Council denied review February 6, 2014 and, pursuant to an extension granted by the SSA, Plaintiff timely filed this action for judicial review under 42 U.S.C. § 405(g) on April 18, 2014. (*See* R. 2.)

## II. STANDARD OF REVIEW

On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported the decision with substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind could accept as adequate to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the Agency's own rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not

5

substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Because the ALJ is in the best position to judge the claimant's credibility, credibility determinations must stand unless "patently wrong." *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010).

### III. ANALYSIS

**A. Treating Physician's Opinions**

Plaintiff argues the ALJ erred by failing to accord proper weight to her treating physician's opinions that she was totally disabled. Under the regulations, a treating physician's opinion must be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence [of] record." 20 C.F.R. § 404.1527(c)(2). Here, the ALJ gave Dr. Kneeland's opinions "little weight" because they were not consistent with substantial evidence during the relevant time period, including Plaintiff's subjective reports and her doctor's objective findings. The ALJ also reasoned that Dr. Kneeland's opinions were rendered long after Plaintiff's date last insured and related to her condition at that time. (R.34.) This was not error.

First, it was entirely reasonable to discount Kneeland's 2013 opinions when the relevant time period was 2010 to mid-2011. *See Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011) (affirming Commissioner's rejection of medical source statement provided two years after date last insured). The medical source statements completed by Dr. Kneeland are silent as to what Plaintiff's condition was prior to June 30, 2011. For this reason alone, the ALJ was justified in according them little

6

weight.

Moreover, as the ALJ noted, Dr. Kneeland's actual treatment records for the relevant time period do not appear to be consistent with his opinion of total disability. Plaintiff argues the pre-date-last-insured treatment records are not "cut and dry"; she emphasizes the rapid weight gain, apparently due at least in part to diabetes medication, and the high glucose levels in February 2011. The ALJ, on the other hand, as did Dr. Foster, reviewed the relevant records and concluded Plaintiff's condition was under control when she took her medication. This court cannot re-weigh evidence and therefore the SSA's conclusions must stand.

Plaintiff also argues the ALJ improperly dismissed Kneeland's opinions by reference to a "single notation that Plaintiff stated she was 'feeling good.'" (ECF No. 16 at 5.) That is simply not accurate. The ALJ did not cherry-pick Plaintiff's subjective report from one snapshot in time; rather, the ALJ noted many subjective statements and the objective evidence and concluded it could not be squared with Kneeland's later opinion. Thus, Plaintiff's "cherry-picking" argument is unavailing. What is totally absent from Dr. Kneeland's treatment records that pre-date Plaintiff's date last insured is any complaint by her that she is having difficulty walking or remaining on her feet. A week after her date last insured, Plaintiff reports she "has been feeling good" and is described as "a healthy-appearing female in no acute distress" and is assessed with "mild peripheral neuropathy." (R. 235.) Again, there is no report of any difficulty or limitations in walking or standing.

Plaintiff also argues the ALJ's discounting Dr. Kneeland's opinion resulted in an RFC that was not supported by substantial evidence. Plaintiff again re-hashes the evidence she thinks supports her position and asks this court to accept Dr. Kneeland's opinion of total disability and reject the ALJ's and Dr. Foster's conclusion that she could perform light work. For the reasons stated, I

7

cannot do that.

**B. Step Three**

Plaintiff also argues the ALJ failed to consider an applicable listing at step three of the sequential evaluation process, but the argument is without merit. At step three, the SSA considers the severity of the claimant's impairments, including whether the claimant has an impairment that meets or equals one of the listings in appendix 1 of subpart P of 20 C.F.R. part 404. 20 C.F.R. § 404.1520(a)(5)(iii). Listing 9.00 lists endocrine disorders, including diabetes mellitus. It provides information about diabetes:

> Both type 1 and type 2 DM are chronic disorders that can have serious disabling complications that meet the duration requirement. . . . With type 2 DM—previously known as "adult-onset diabetes mellitus" or "non-insulin-dependent diabetes mellitus" (NIDDM)—the body's cells resist the effects of insulin, impairing glucose absorption and metabolism. Treatment of type 2 DM generally requires lifestyle changes, such as increased exercise and dietary modification, and sometimes insulin in addition to other medications. While both type 1 and type 2 DM are usually controlled, some persons do not achieve good control for a variety of reasons including, but not limited to, hypoglycemia unawareness, other disorders that can affect blood glucose levels, inability to manage DM due to a mental disorder, or inadequate treatment.

20 C.F.R. part 404, subpart P, appendix 1, 9.00B.5.

Plaintiff argues the ALJ inexplicably failed to even consider listing 9.00. But the Commissioner correctly responds that that listing is not an independent one that can be met without consulting the cross-referenced listings provided therein. Listing 9.00B.5.a.(ii) describes chronic hyperglycemia, the listing Plaintiff claims the ALJ failed to consider, as follows:

> Chronic hyperglycemia, which is longstanding abnormally high levels of blood glucose, leads to long-term diabetic complications by disrupting nerve and blood vessel functioning. This disruption can have many different effects in other body systems. For example, we evaluate diabetic peripheral neurovascular disease that leads to gangrene and subsequent amputation of an extremity under 1.00; diabetic

8

retinopathy under 2.00; coronary artery disease and peripheral vascular disease under 4.00; diabetic gastroparesis that results in abnormal gastrointestinal motility under 5.00; diabetic nephropathy under 6.00; poorly healing bacterial and fungal skin infections under 8.00; diabetic peripheral and sensory neuropathies under 11.00; and cognitive impairments, depression, and anxiety under 12.00.

Listing 11.14 in turn lists peripheral neuropathies as "disorganization of motor function as described in 11.04B, in spite of prescribed treatment" and 11.04B lists "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station."

The ALJ explicitly noted she considered listing 11.14. (R.31.) That is exactly what listing 9.00B.5.a.(ii) states she must do. The ALJ reviewed the medical records and reasonably concluded: "Overall, when compliant in taking her medications and checking her blood sugars, treatment notes indicate that her diabetes was generally under good control during the relevant period." (R.33.) Noting Plaintiff's high glucose levels in late 2010 and 2011, Plaintiff argues there is "persistent evidence" she suffered from "uncontrolled" diabetes mellitus. (ECF No. 16 at 9.) She notes this led to diabetic neuropathy in her foot and therefore the ALJ should have considered whether she met the chronic hyperglycemia listing noted above. That Plaintiff had type 2 diabetes that resulted in neuropathy does not necessarily mean she is disabled under listing 9.00; rather, as the ALJ noted, the question was whether the resulting neuropathy met the more specific criteria listed. Notably, Plaintiff does not even argue the ALJ erred in concluding that she did not meet the specific criteria. In sum, the ALJ did not, as Plaintiff argues, fail to consider whether Plaintiff's diabetes met applicable listings—rather, the ALJ did just that. And she did not commit reversible error by failing to explicitly cite listing 9.00.

9

**C. Credibility**

Plaintiff also argues the ALJ's credibility determination was not supported by substantial evidence. She points to parts of the record that support her statements and argues it is thus reasonable to call the ALJ's credibility determination into question. (ECF No. 16 at 10–11.) Not so. The question is not whether this court agrees, but whether a credibility determination is "patently wrong." *Skarbek v. Barnhart*, 390 F.3d 500, 504–05 (7th Cir. 2004).

The ALJ found Plaintiff "not entirely credible" in light of her activities of daily living as well as "the objective medical findings, physical exam findings, and overall treatment documentation." (R.33.) The analysis is far from compelling. The activities of daily living the ALJ notes are "driving, shopping, limited cooking and household chores, reading, watching television, handling her own money, and going to church." (*Id.*) The Seventh Circuit has warned against citing these kinds of modest activities to undermine a claimant's disability claim. *E.g.*, *Scrogham v. Colvin*, 765 F.3d 685, 700 (7th Cir. 2014); *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004). In addition, a credibility determination should not be based on a lack of "physical exam findings"—it is because objective medical evidence alone is often insufficient to judge subjective statements about symptoms and pain that the SSA's regulations require the ALJ to consider factors "in addition to the objective medical evidence" when assessing credibility. *See* Social Security Ruling (SSR) 96-7p, 1996 WL 374186, *7 (July 2, 1996).

Nonetheless, I find no reversible error here. It is not as if the ALJ rejected Plaintiff's statements that at times she experienced burning and freezing sensations in her feet. Given the limited RFC here—light work with only occasional climbing of ramps and steps and the allowance of being off task 10% of the workday—it is Plaintiff's statements of the more extreme limitations

that were rejected. Plaintiff claimed that due to her symptoms she could not sleep, could not breath, could not walk a block and could not stand more than 5–10 minutes. (R. 63–65, 186.) The relevant treatment records, which as noted above is one of the bases upon which the ALJ rejected these claims, are simply not consistent with the extent of limitations Plaintiff described to the SSA. As the ALJ noted, the 2010 and 2011 treatment notes show Plaintiff consistently telling Dr. Kneeland she was feeling good, including that she was sleeping well and even feeling better when walking. Plaintiff's condition obviously got worse, but given the evidence Plaintiff presented that pertained to the time she was insured, I cannot find the ALJ's rejecting her statements of extreme limitations was patently wrong.

Plaintiff also argues the ALJ erred by basing the adverse credibility finding on Plaintiff's long-standing history of non-compliance with treatment. Plaintiff argues the ALJ should have asked her whether she had "good reasons" for failing to follow prescribed treatment. *See* 20 C.F.R. § 404.1530(c). However, Plaintiff's noncompliance with treatment was not a basis for the ALJ's credibility finding; those bases are noted and discussed above. Instead, the ALJ discussed non-compliance with treatment in relation to the severity of Plaintiff's diabetes during the relevant window. (*E.g.*, R.33) ("Overall, when compliant in taking her medications and checking her blood sugars, treatment notes indicated that her diabetes was generally under good control during the relevant period.") (citations omitted). Accordingly, I cannot reverse on this ground either.

## D. Step Four Finding and Completeness of the Record

Plaintiff also argues the ALJ's step-four finding that Plaintiff could do her past relevant work as a housekeeping cleaner was unsubstantiated by the record and the incomplete record, including the transcript of the video hearing in which certain parts of the vocational expert's testimony were

11

"inaudible," must be remanded for further development. I disagree.

The ALJ's step-four finding was based on the following exchange with the vocational expert, John Reiser:

> Q   And, Mr. Reiser, I'd like you to assume an individual of the claimant's age and with her education and work history who would be limited to light work; no climbing ropes, ladders or scaffolds; only occasionally climbing ramps and stairs; may be off task up to 10% of the workday exclusive of normal breaks.
>
>   Could that person perform any of the claimant's past relevant work?
>
> A   Your Honor, the housekeeping job at both the motel and at the hospital would be doable with the [INAUDIBLE].
>
> Q   And if this individual was further limited to only occasional bending and occasional twisting? Does that change your answer?
>
> A   As a matter of fact, no. The housekeeping cleaner per the Selected Characteristics of Occupations which is a companion edition to the DOT, rates the bending and stooping job as occasional and I [sic] doesn't rate twisting, but again I would leave it with the occasional. There would be [INAUDIBLE].
>
> Q   Okay. And what if the person could never squat, does that change your answer?
>
> A Yes, I don't think that that job would be doable. I think squatting on occasional [sic] would have to happen.
>
> . . . .
>
> Q   And what if this person because of pain and other symptoms would be off task more than 10% of the workday, would that change your answer?
>
> A   Yeah, that's work preclusive, Your Honor. That's going to be a degree of [INAUDIBLE] for the task at hand and that would get the person fired. They'd be subject to discipline and if they didn't pick up the pace, they would have – probably lose their job. No jobs.
>
> Q   I have no further questions.

(R.74–76.)

Plaintiff argues the first "inaudible" reproduced above shows some unknown "caveat" on Reiser's affirmative answer and therefore the record in this form does not support the ALJ's finding that Plaintiff could perform her past relevant work as a housekeeping cleaner. Plaintiff also argues the expert's answer that an employee off task more than 10% of the workday is unemployable renders the ALJ's RFC finding, which allows Plaintiff to be off task up to 10% of the workday, internally inconsistent.

Based on the foregoing, this court is not authorized to remand this case under sentence six of 42 U.S.C. § 405(g). *See gen. Acevedo v. Barnhart*, 474 F. Supp. 2d 1001 (E.D. Wis. 2007) (discussing differences between "sentence four" and "sentence six" remands). Unlike a sentence four remand, which constitutes a decision on the merits of the case, in a sentence six remand the court retains jurisdiction of the case to allow the SSA to consider new evidence and/or reconstruct the record. *Id.* at 1003 (collecting authority). Such a remand may be ordered in only two situations: where the Commissioner requests remand before answering the complaint, or where new, material evidence is adduced that was for good cause not presented before the agency. *Id.* (quoting *Shalala v. Schaefer*, 509 U.S. 292, 297 n.2 (1993)). Neither situation exists here.

Moreover, I decline to remand under sentence four, as a decision on the merits, because of the transcript. Of course, the court would prefer not to have to guess what was said at the hearing. But it is highly unlikely that whatever was said in the gaps would be outcome determinative. Essentially, the only outcome-determinative possibility would be that the expert's answer to the initial question did include a substantive caveat. That would mean the expert never actually provided an unqualified opinion that the hypothetical claimant in the ALJ's questions could perform Plaintiff's past relevant work. Rather than proceed to step five of the sequential evaluation process, however,

the ALJ concluded her questioning after this exchange.

It is much more reasonable to conclude that the expert's answer to the ALJ's initial hypothetical was an unqualified affirmative one. The transcript shows a course of questioning that is common in social security hearings: the ALJ supposed a hypothetical claimant with certain limitations (that were entirely consistent with her later RFC finding); the expert testified that the housekeeping cleaner position would be "doable with the [INAUDIBLE]"; the ALJ then added further limitations until the expert answered that the hypothetical person could not any perform past relevant work. Specifically, the ALJ added the limitation of no squatting and then the limitation that the person would be off task *more than* 10% of the workday. The expert testified that each limitation would require him to change his answer. In context, then, it is natural to read the expert's answer to the original hypothetical as an unqualified affirmative one. Accordingly, I decline to remand on this basis.

### E. Duty to Develop the Record

Finally, Plaintiff argues that the ALJ should have contacted Dr. Kneeland and asked for his opinion as to Plaintiff's condition at the time of her alleged onset date. (ECF No. 16 at 15.) However, the argument presumes Plaintiff became disabled after her date last insured, a presumption the ALJ was, of course, not obligated to make. In her reply brief, Plaintiff purports to clarify her argument that the ALJ breached her duty to develop the record: "Plaintiff's opening brief[] argued only that if there was some ambiguity with respect to the timing of Dr. Kneeland's opinions, then it was the duty of the ALJ to further develop the record by re-contacting Dr. Kneeland to clarify his opinion." (ECF No. 21 at 7.) That the ALJ rejected Plaintiff's argument about the import of Dr. Kneeland's opinion does not render the opinion ambiguous. Plaintiff must present evidence showing

14

her disability during the time for which she was insured. She introduced the treating source opinions that the ALJ, as noted above, validly rejected. The ALJ did not breach her duty to develop the record by failing to ask Kneeland to supplement or clarify those opinions.

## IV. CONCLUSION

For all of these reasons, the Commissioner's decision is affirmed. The Clerk is ordered to enter judgment accordingly.

Dated this  24th  day of March, 2015.

                                            s/ William C. Griesbach
                                            William C. Griesbach, Chief Judge
                                            United States District Court